Thank you very much. Thank you very much. The counsel case is well argued. We'll take it under advisement. Call our last case of the day, United States v. Mark. Good afternoon, Your Honor. Good afternoon. I have the pleasure of saying good afternoon while everyone else says good morning. Yes. We wish we could say good morning. That's all right. My name is Robert King and I am the attorney for Delia Mark who is the appellate in this  This appeal was filed primarily because initially my understanding of this case was that the case was that there were two separate cases that were being brought. They were being brought by the government of the Virgin Islands. For the sake of clarification, one is labeled Red Ball One and Red Ball Two. Now, the government in presenting its case, and I was— Do you wish rebuttal time? Oh, yes, Your Honor. Three minutes, please. Yes. The government in presenting its case, as I was involved in the initial trial, presented it in such a way and had the indictment written in such a way until it was uncertain whether     Do you wish rebuttal time? Oh, yes, Your Honor. It was uncertain, exactly the time periods that were being charged and the offenses that were being charged. We knew that under Count One and Count 18, the defendants were being charged with a conspiracy of import and a conspiracy of possessing distribution. Now, the conspiracy of import, we didn't recognize from the trial that that was the same conspiracy that was being alleged in Red Ball Two. Can you make a request for more explicit information? Your Honor, it was based, well we asked for lots of requests for information in this case. And we in fact stated that the government, what they'd given us, a lot of it was redacted and we couldn't tell enough information about the case. The court just basically told us the government was providing us the information on a timely basis and we would have it. One of the things that I objected to initially was the allowance of testimony with Mr. Elton Turner because I knew that there was a second case involved and that case involved what was supposed to be a conspiracy, some kind of conspiracy involving importation of cocaine and this involved the Springett matter. And I asked the judge to recuse himself because the judge had been in the United States Attorney's Office at the time when Mr. Springett was wanted and Mr. Springett was in fact brought to trial. So I was suspicious that these things might be the same. This confirmation however came in the government's closing argument, which was a rebuttal closing argument to the jury. In the rebuttal closing argument to the jury and the fact that the government was faced with the possibility of an acquittal, the government said something that stuck. And the government said that this, the thing that we're alleging was a single conspiracy with a succession of leadership. And if they were alleging a single conspiracy with a succession of leadership, then what we really had was one conspiracy that didn't have been divided into two cases. This also became clear that something was- Was this proof adduced in both trials of the exact same conspiracy? Because all we have, you know this was expedited and we have not had as much opportunity to I see here different actors and different time periods and a different object of the conspiracy. You've got government's slight of hand. This is a magic act. You've got slight of hand. Here's how you have slight of hand. You've got the government alleging initially by some strange language that a conspiracy existed from a time unknown, but at least by accident. You stay at the microphone so we can get your- Yes. You've got the government alleging that the conspiracy commenced from a time unknown in the past, but at least say from a certain date. Is that as to both? That is as to both cases. You never had a starting period for either? Never had a starting period for either one. The only thing that gives us a starting period is a testimony of Mr. Elton Turnbull, who is the principal witness, who is one of the principal witnesses in both cases. Mr. Turnbull is the person who provides the nexus. But you have overt acts. Correct. And if we get stuck into overt acts, we're actually getting stuck into what the government has in terms of its slight of hand. What we have in this case is we have a conspiracy which is supposedly alleged that includes the importation of cocaine. This is why I was initially less than confused. The importation of crack and the importation of marijuana, and this is all in Red Ball One. However, the slight of hand comes when you start to realize that nobody ever imports crack. Not a soul in this country would import crack because it's made from the cocaine itself. So you don't. The government never intended to prove an importation of crack. And there was no evidence in this case concerning the importation of crack. Okay. What's the government? The other portion of the slight of hand. We're talking about overt acts. Can I just get you off track just for one minute? Sure. Now, in reading the judge's opinion, he found that the claim of double jeopardy was frivolous. Okay. If we agree with you that it was not frivolous, isn't the proper remedy to send us back to the judge? Because you're giving us a lot of information here. We weren't there. Isn't the right thing, if you're right, to send us back to the district judge to have an evidentiary hearing? Under normal circumstances, I would absolutely agree with you. However, everything is in the record that's before this court. We've had a full-blown trial of this matter. We've had a full-blown trial that went to trial by jury. We have all the facts are in. There's nothing for us to have a hearing on. Who oversaw these two trials? Judge Gomez. Both. Both trials. And ruled after the fact. And ruled after the fact. He initially ruled that when I tried to exclude the testimony of Mr. Turnbull, that Mr. Turnbull's testimony was, in fact, essential to the government's case. That's when I first had the inkling that, well, these cases may be the same. What we have in this case, there was no evidence. What was he so wrong? What is it he's saying that is so wrong with respect to his having heard the evidence in both cases and saying these are different? They're not. No, no, no. What is it? Where is he specifically wrong? The drugs themselves are exactly the same. The cocaine that is supposedly brought from South America, dropped off the coast of Tortola, picked up, delivered by boat, by the same people, over to the Coral World dock, the is in the state content, I want to believe, from my memory, state content, where it's held. And then it's distributed. Were the objectives of the conspiracies entirely distinct? No. The objectives were not distinct. I mean, didn't one conspiracy have to do with distribution of drugs in St. Thomas, whereas the other conspiracy had to do with exporting drugs outside of St. Thomas? Well, I consider that to be detailed. I consider that to be, it's like me sitting in New Jersey, and I'm in New York, but I'm supposedly the drug kingpin in New York, and I make my distribution and my agreement, the locus criminus in New York, and I pass out the drugs here in New York, but because they end up in New Jersey, that doesn't make it a separate and distinct conspiracy. But if you have two separate agreements to engage in two separate objectives, and the two separate agreements, why wouldn't that be two separate conspiracies? But there, the proof in this case does not show two separate agreements. What you have is, you have the individuals who did the importation, the agreement to do the importation into the Virgin Islands are exactly the same individuals. There's no, not one individual who's different. You've got, the government talks about Mr. Turnbull, Mr. Spriggan, they talk about a guy, they talk about another person who's a boat captain who brings drugs over, Mr. X. It sounds like the leadership might have had, I mean, conspiracies might have had common leadership, but the people below the leadership. Okay, if you're talking about street-level dealers, then you have a question of whether there's a conspiracy at all involving those street-level dealers, or whether or not that's just a buy-sell transaction. But the conspiracy itself, what we're talking about is, what they, where the agreement existed, and what was the nature of the agreement. And the nature of the agreement, from the facts of these two cases, was simple. If the government's correct, and they brought drugs into the United States, the agreement was, we're combining to bring drugs into the United States. It's a consolidation. That conspiracy is complete. Once these drugs are here, that computes, the importation is complete. Was there a difference in the quantity of drugs involved in the distribution, in conspiracy one versus conspiracy two? No. Just the same drugs. There's no distinction. I understand that there were similar drugs, but the quantities. I mean, there were small amounts that would be for street-level distribution, and large amounts that would be for exporting. There's no such evidence in this case. There's none in this case. I thought there was. I haven't seen it. But you're saying it's not part of the record? No. In any event, Your Honor, I see my time has expired, and I would like to save time for rebuttal. You have two minutes more. That's your yellow light. You're only finishing on the red light. Very good. In other words, when Your Honor asked, well, was there additional or different drugs, there was not different drugs. It's not just a matter of money. No, it's different amounts. I understand the drugs. One drug. And I don't know the amounts. There's nothing that tells you what the amounts are, in this case, in either one of the cases. And what we do know is that, from what the government says, is that the drugs were brought to some central point, which would have been the farm. And from that point, the drugs were distributed from that farm. Now, granted, the drugs are distributed in New Jersey or distributed in New York. In this case, some drugs were supposed to be given to a courier and taken to mainland United States. Some drugs were supposed to be delivered to Mr. Fagan, who then delivered them locally. But both the conspiracy to distribute and both the conspiracy to import, all of those things were completed. All of those things were completed by the same individuals under the same facts. Now, there is a divergence of facts, and I don't say that there's not a divergence of facts. What I do say is that, under the leotard standard, United States versus leotard, which was decided by this court, 8-17-10-74, that the first thing we must consider is the locus criminus of the offense. And we've already determined, based upon the facts that we talk about, that the locus of this offense is always in both offenses, in Red Ball One and Red Ball Two on the Virgin Island. The significance of the temporal overlap, the way that the complaints are drafted, the information, the prosecutorial instrument is drafted in this case. Does the complaint itself, in fact, state opening, I mean, the start times for the conspiracies? No, it does in a sense. Let me, I'll just give you this information, see if you disagree on it. Red Ball One's complaint began no later than November of 2004, whereas Red Ball Two began sometime around 1999. Isn't that what's charged in the indictment? No, sir. I think if you look at the language, it says it began not later than. It started at a time unknown, and then it kept going, but it started no later than at this time. So, it could have started, in other words, it could have started in 1999 at the same time as the other conspiracy. We don't know what they're alleging. And then the end point of the conspiracy is within either 30 days or one day of each other, meaning that one ended November 30th, 2005, and the other ended October 31st, 2005. All right, counsel, we will hear from you on revote. Thank you very much. Thank you. Good afternoon again, your honors, counsel for the defendant, Delia Smith on behalf of the United States. Your honor, there's absolutely no basis to even suggest that the two conspiracies charged in these two indictments have any commonality other than the fact that two defendants are the same. Nothing, nothing else in these facts have led to anything that is similar other than the fact that two defendants are the same. Well, wait a minute. How about the importation? How about the way the drugs came in and how about they're being sent to someplace called the farm? Yes. And in both conspiracies, the drugs were transported in the same fashion to the same place from which they were further distributed. Just like counsel for defendant suggested, the Leotard case outlines the four-pronged test for determining whether or not you're dealing with a single or multiple conspiracy. Yes, there is a commonality in where the drugs came from. All cocaine comes from South America. There is also some slight overlap in the time period for which these conspiracies occurred. But that is to suggest that two crimes could not be committed within the same period. Third, there is another commonality as to the individual who was picking up the load and the suggestion that it was being held at a farm. But what Leotard says, the most significant factor to consider when determining whether a single or multiple conspiracy exists is to consider the objective, the agreement of these individuals as to what their common objective, what is their goal, what are they seeking to accomplish. In the second trial, Your Honor, we are talking about, and counsel, when asked by Your Honor regarding the sizes of these quantities of drugs that are involved in these conspiracies, Your Honor, over the period of time that is alleged in the Red Ball 2 conspiracy, the testimony in this case, Your Honor, is that on a weekly basis, there was at least 10 kilograms and as much as 30 kilograms of cocaine being transported using drug couriers, using airport baggage handlers who are illegally entering the airport using their secured access to secret these 10 to 30 kilograms on a weekly basis of cocaine, raw, pure cocaine, upon onboard commercial aircrafts that are destined to several states within the contiguous United States. When they arrived in the states, different members of the second conspiracy are then distributing these drugs on large scales in Baltimore, New York, Philadelphia, North Carolina, Atlanta. This is a large scale. The testimony of the cooperating witness is that every week he sent $190,000 cash money by drug couriers back to this organization. If you could characterize the evidence in Red Ball 1 versus 2, you would say that the evidence in Red Ball 2 was distinctly, well, I'm looking here, distributed through the airport for distribution within the various states in mainland US, but the Red Ball 1 was specifically within the Virgin Islands? Totally within the Virgin Islands. That operation in Red Ball 1. Specifically St. Thomas? Only St. Thomas. The evidence in this case shows that there was an undercover operation where a cooperating witness under an agreement that he signed with DEA would go into the Savon area of St. Thomas, he would buy certain packs of cocaine, he would buy certain dime bags, what they call dime bag or $10, $20 bags of marijuana, he would buy coke in the same small package, individually packaged, and this went on for a period of four months. Counsel, I think your adversary pointed out the testimony in Red Ball 1, I think by Mr. Turnbull, about sending the drugs to the US. Isn't there a crossover there? Isn't that problematic? No, Your Honor, because Mr. Turnbull's testimony was simply to give the jurors an overview as to how the operation worked, that they purchased boats, that they picked up large scales. I think his testimony was that on average there was a load of 430 keys being picked up from the rendezvous point north of Tortuga. But his testimony about sending drugs to the United States during Red Ball 1, aren't you giving that to the jury? Not at all, Your Honor, because Mr. Turnbull's testimony ended with the delivery, the handling, the boats, the individuals who were on the boats, essentially Mr. Turnbull's testimony gave an overview of how drugs come from South America, how they're brought in by plane, they're dropped at a rendezvous point, they're placed on these boats that are waiting, and then they're taken to the British Virgin Islands where, Your Honor, there are Tertullians, what we would refer to as people from the BVI, waiting for their stash, there are Colombians waiting for their stash, there are Puerto Ricans waiting for their stash, and then we have the Santonians. You don't think that... So that's the limit of Mr. Turnbull's testimony, to show the overview of how drugs can in fact make it into this territory. You don't think it's problematic when the government can charge separate conspiracies based solely on the destination of the drugs? No, Your Honor, it's not solely on the destination. Let's take a hypothetical and you can give me a response. Supposing the drugs came to St. Thomas and they were then distributed at street level in St. Thomas and then they were further distributed back to St. Thomas. No, Your Honor, this is not the facts. Those facts are absolutely dissimilar to what... Well, I'm just curious about the government's decisions in a case like this. Well, the decision is made based on the objective of the parties, the agreement of the parties to commit a particular crime. And the slight overlap of time or location does not, according to law by this circuit, does not prove that there's a single conspiracy. But isn't the only dissimilarity then the destination of the drugs and who might be handling them at their final point of destination? No, Your Honor, because in order to make this conspiracy work, you have to have this group of individuals who are working independently, not dependently, on each other to effectuate their crime. So you're saying the people in Red Ball One who were the distributors or the persons who were farther down in the chain... Yes, Your Honor. ...did not know anything about... Completely separate. In the Red Ball One, Savant, St. Thomas, local street level, small crack buys, marijuana and cocaine distribution, you're talking about defendants Dinsey, Boudou, you're talking about Thompson, you're talking about Mr. Fagan, Mr. Marks. These defendants, the ones who were doing the distribution on the streets of St. Thomas, Your Honor, have no relations, have no knowledge of the defendants in the second indictment which charged... So Mark and Fagan are at the top, aren't they? Yes, Your Honor. And when you say they're both, you say there's two conspiracies, what about the consideration that we have given to conspiracies where the activities are interdependent or mutually supportive, which would support an inference that there's just one conspiracy? Weren't these activities mutually supportive? No, Your Honor, absolutely not. Because to suggest that they are mutually supportive would suggest that the people are all combined in the same agreements, knowing of each other, working towards the same goal. The type of money that they made in the second stateside operation, Your Honor, were, I mean, the money was, there was absolutely no similarities. You're talking about $100 a day sale of crack cocaine on the streets of St. Thomas only to residents of this island, where people, the defendants stood on the sides of the street, waited for individuals, and the testimony would show that in Red Ball One, we have the testimony of five cooperating defendants who purchased, over the four-month period, sizable amounts, on a daily basis, $200 worth of crack, cocaine, and these were all part of the Title III investigation. They had no knowledge, they knew nothing of the operation that occurred in the stateside distribution with the baggage handlers, with the aircrafts, with the drug couriers, with the distribution, they shared no interest, they benefited from nothing, the sales, all that money. The only two people that benefited in the 22 defendants that were charged in two indictments were Mr. Mark and Mr. Fabian. That is it. The street-level distributors on St. Thomas were simply making a couple hundred dollars a day based on how much crack they could sell, and how much marijuana they could sell, how much cocaine they could sell, and when we talk about the size of the cocaine or the distribution of the crack and marijuana, it is absolutely separate and removed from the market. There are huge and large kilograms of cocaine that was distributed by sale in the United States. They are separate and apart. You would say in this case that the evidence used to prove one conspiracy was the same as to prove the other conspiracy? No, absolutely not. In terms of the importation of the drugs and in terms of the ship was the same, the ship captain was the same, the farm, the place the drugs were stashed was the same? Well, Your Honor, we never alleged that there was a ship captain in Red Ball One. Mr. Ells, who was the boat captain, who we charged in Red Ball Two, was not prosecuted in Red Ball One. He wasn't prosecuted. It was the same ship captain. The same guy steered the boat and bought the drugs. Well, Your Honor, that's no different than saying that all four hundred... It's okay. Stay with me. But at that point, then you say the evidence differed when it came to the objective or purpose of the conspiracy. Yes, Your Honor. And the drug quantity. Is that your case? Yes, it is. Okay. Because, Your Honor, the analogy I'm trying to make for the court is that if we're saying that we cannot have two separate objectives and agreements from these facts, it would also suggest that four hundred and thirty kilograms coming on a weekly basis and being distributed to almost five different groups on any given week would all be charged in the same conspiracy. Was it proven that the drugs, in being imported or coming into St. Thomas, was already destined for one of the different locations? No, it was not. So it was determined at the so-called farm where the drugs were going by the... No, Your Honor. Actually, the farm was... There was never any proof that the farm was where the drugs was being stored. The government offered the farm, based on the testimony of Mr. Turnbull, with discussions he's had with Mr. Marr, that that was an ideal location for the storage of cocaine. He was your witness. Yes, he was, Your Honor. But we never said that the farm was the storage place. We offered it as a testimony of Mr. Turnbull that the discussions they had was that that intended location would be perfect for hiding the drugs because they wanted to bury the cistern some ten feet beneath the earth's surface. But there was never any evidence that that was, in fact, where the drugs was being stored. We offered the testimony because of those discussions and because it was a perfect location for storage of drugs, but there was never any evidence that that's what the group actually did, Your Honor. But these two cases could not be more materially dissimilar when it comes to the agreement and the objective. And even this circuit has ruled that that is the cornerstone. The determination for single conspiracy must end at the discussion as to whether or not the objectives and the overall agreement of the groups are same in fact and in law. And in these two cases, they are not. And we would ask that the court affirms the decision of the lower court that these are two separate and distinct conspiracies. Question. The overt acts charged were during different time periods. Was the evidence at trial that these were going on at totally different time periods or did they overlap or were they the same but you just picked some overt acts that were different times? No, Your Honor. The overt acts in Red Ball 1 is alleged to have occurred between November 2004 and October 2005. The overt acts in Red Ball 2 were alleged to have occurred from a period starting no later than 1999 up until October 2005. We never denied that there was a year within which the two operations thrived, but we knew and only could prove that the street level started in November 2004. But there was evidence in Red Ball 2 that the operation started from 1999. Thank you. Your Honor, sometimes it's said that the devil is in the detail. And what I mean by that is the government is trying to rely upon the details of individual sales to draw a distinction that really doesn't exist. The government's proof in both trials was identical. If you're on a review of the testimony of Mr. Elton Turner, he testifies in both trials how he met Mr. Gillian Mark in 1999 and how that association began in 1999 and how the drug transactions took place from approximately 1999 or 2000. The agreements that he talks about, they're not separate agreements. There's one agreement. There's one agreement about importation. Then there's one agreement about possession and distribution. The fact that you have individual dealers in New York, New Jersey, Unica, where I was born, you have individual dealers in that little town called Unica. It doesn't mean that they're a member of a conspiracy. It means that they're individual dealers. It's the agreement that counts. The government wants to argue the details. The government wants to argue that because it drafts a pleading such that it seems to start at one date, but it hides the actual date it starts, that there's two different conspiracies. What belies all of this are the agreements and the facts that the government puts forth to the jury. What belies all of this are the arguments that were made by government counsel to the jury when she was faced with the argument that the jury should acquit if it was a part of another conspiracy. The government then argued, no jury, this is not a separate conspiracy. It's all one with a succession of leadership. The government shouldn't be heard and shouldn't be allowed to artfully draw a pleading so as to make us stand here and argue over when the conspiracy began and when it ended. It should be clear what conspiracy the government's talking about, not just from the pleading itself, but from the facts presented at trial. The facts presented in these two trials, they don't just indicate. They prove to us that the conspiracies that exist are one. It's one conspiracy to import and one conspiracy to distribute, and the government, for whatever reason, as I stated before, they did it because of the pure complexity of the prosecutorial task. How lengthy was Red Ball One? Your Honor, we began that trial, it was about three weeks, three weeks long trial. No, I mean Red Ball. Red Ball One was about three weeks. How about Red Ball Two? Red Ball Two was equally long. Because actually, to look at this thoroughly, we probably need to review the transcripts of each of these trials. I don't know that an appendix has really been filed. Yes, it has. The appendix contains both of the transcripts from the trials. That's why we have specific references to the transcript pages in both trials. This is probably the most difficult appeal that I've ever argued because I had to read two trials, one I did and one I didn't do, in order to try to find the similarities and to convince myself that a double jeopardy claim in actuality existed and there wasn't just a mere overlap of facts or a mere overlap of a time period because there isn't a mere overlap. This is exactly the same. We must protect ourselves against re-prosecution, against multiple prosecution, and that's precisely what the United States Constitution provides, that we shall not be twice put in the trial. On that basis, Your Honor, I would ask Your Honor not to send it back for an evidential hearing. All both transcripts are before Your Honor. Please decide this matter. Rule that the government cannot have multiple prosecutions in violation of the double jeopardy clause. Thank you. Thank you, Mr. King. Thank you. The case was well argued, but Mr. King has spent, and we will take the matter under Thank you, Your Honor. Thank you.